UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

BARBARA M. ELLIS,                )
                                 )
          Plaintiff              )
                                 )
     v.                          ) CIVIL NO. 2:10 cv 452
                                 )
MICHAEL J. ASTRUE, Commissioner, )
Social Security Administration,  )
                                 )
          Defendant              )

<u>OPINION AND ORDER</u>

This matter is before the court on the petition for judicial review of the decision of the Commissioner of Social Security filed by the claimant, Barbara M. Ellis, on November 12, 2010. For the reasons set forth below, the decision of the Commissioner is **REMANDED**.

<u>Background</u>

The claimant, Barbara M. Ellis, applied for Supplemental Security Income on July 19, 2007, alleging a disability onset date of June 28, 2007. Her claim initially was denied on September 26, 2007, and again upon reconsideration on November 27, 2007. (Tr. 64, 74) Ellis requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 78) A hearing before ALJ Sherry Thompson was held on November 4, 2009, at which Ellis and vocational expert Richard T. Fisher testified. (Tr. 30-59)

On December 7, 2009, the ALJ issued her decision denying benefits. (Tr. 11-23) The ALJ found that Ellis was not under a disability within the meaning of the Social Security Act from June 28, 2007, through the date she issued her decision. (Tr. 23) Following a denial of Ellis' request for review by the Appeals Council, she filed her complaint with this court.

Ellis was born on October 23, 1960, making her 49 years old on the date of the ALJ's decision. (Tr. 23, 117) She is 5'8" in height and weighs approximately 201 pounds. (Tr. 257) Ellis has a ninth grade education and reported that she took special education classes while enrolled in school. (Tr. 38-39) She last worked in June 2007 as a housekeeper at a hotel. (Tr. 38-39)

Ellis' physical diagnoses include multiple sclerosis, fibromyalgia, chronic pain syndrome, ataxia, diabetes mellitus, gouty arthritis, cervical neck pain with C5-C6 radicular pain, peripheral neuropathy, diabetic neuropathy, osteoarthritis, hypertension, gait disturbance, low back pain, headaches, anemia, poor balance, vertigo, and degenerative disc disease. (Tr. 207, 303, 351, 354, 359, 365, 368, 370, 374, 377, 389, 437, 439, 452, 461) She also was found to have borderline intellectual functioning and depression. (Tr. 266)

Dr. I. Benjamin Anigbo was Ellis' primary care physician, who she saw once a month. Dr. Anigbo diagnosed Ellis with anemia, accelerated hypertension, multiple sclerosis, gout, carpal tunnel, and neuropathy. (Tr. 303, 359, 360, 365, 370, 374) Ellis originally presented to Dr. Anigbo with pain in her hands, arms, chest, hips, and back, severe dizziness, insomnia, loss of balance, and weakness in her left leg. (Tr. 359, 363, 364, 365, 367, 370) Dr. Anigbo ordered a BAER test for severe dizziness and ataxia in July 2007. (Tr. 308, 346, 348) In August 2008, Dr. Anigbo ordered a spinal tap and an MRI to test for multiple sclerosis. (Tr. 302, 303) The MRI confirmed that Ellis had multiple sclerosis and indicated a prominent finding on Ellis' left side. (Tr. 389) Dr. Anigbo referred Ellis to physical therapy for her extremity pain. (Tr. 304) When Ellis continued to complain about throbbing in her legs, sharp pain in her hands, lower back pain, dizziness, and pelvic pain, Dr. Anigbo referred Ellis to Dr. C.J. Yoon for treatment. (Tr. 341) Dr. Anigbo continued to treat Ellis, and he noted that she showed signs of gout, hypertension, anemia, demyelination, hyperglyce-mia, and neuropathy. (Tr. 359-60)

Ellis saw Dr. Yoon in 2009 and 2010 for multiple sclerosis, fibromyalgia, chronic pain syndrome, ataxia, gait disturbance, diabetes mellitus, diabetic neuropathy, bilateral carpal tunnel

syndrome, gouty arthritis, ovarian cysts, ulcerative colitis, pelvic tumor, and a fibroid tumor. (Tr. 207, 352) Dr. Yoon noted that Ellis' neck and back strength and range of motion were decreased. (Tr. 206, 209) Ellis had mild muscle tenderness and spasms in her posterior neck and upper trapezius muscles as well as moderate tenderness and spasms in her paraspinal muscles. (Tr. 206, 209, 212, 215, 218, 221, 232) Ellis complained to Dr. Yoon of radiating pain in her lower back, neck, legs, arms and head, dizziness, and numbness in her right foot. (Tr. 231) Ellis reported that physical therapy and Ibuprofen did not relieve her pain. (Tr. 231) On June 22, 2010, Dr. Yoon diagnosed Ellis with osteoarthritis and weakness in her right knee and prescribed a cane for her left hand. (Tr. 460)

Ellis also sought treatment from Dr. Daksha Vyas, a chronic pain management specialist, beginning in May 2009. Ellis re-ported that she had headaches, blurred vision, left-side weak-ness, and numbness and shooting pain in both legs. (Tr. 377) She told Dr. Vyas that the pain prevented her from doing housework and made it difficult to sleep at night. (Tr. 377) Dr. Vyas assessed Ellis as having 3/5 strength in her left upper and lower extremities, a decreased sensation to light touch and vibration over both feet, a limping gait, impaired tandem walking, tender-ness in cervical and lumbar paraspinal muscles, and an inability

to walk on her heels and toes.  (Tr. 377) Dr. Vyas diagnosed Ellis with headaches, cervical neck pain with C5-C6 radicular pain, peripheral neuropathy, and gait disturbance.  (Tr. 377) On May 19, 2009, Dr. Vyas found that Ellis had carpal tunnel syndrome in her left hand, and in August 2009, he found that Ellis had 3/5 strength in her left upper and lower extremities.  (Tr. 438) Dr. Vyas started her on Wellbutrin.  (Tr. 439, 461)  The following May, Dr. Vyas treated Ellis for blurred vision, headaches, ataxia, and low back pain.  (Tr. 461)

In September 2007, Ellis saw a physician and psychologist selected by the Social Security Administration for a consultative examination.  (Tr. 256, 264, 269, 287) Dr. B. Sheikh noted that Ellis had pain in both her shoulders and a restricted range of motion, pain in her lower extremities with instability, and a lack of balance.  (Tr. 258, 259) Ellis was unable to stoop, squat, and walk heel to toe tandemly.  (Tr. 259) Dr. Sheikh concluded that Ellis had a herniated disc at L4-L5 with radiculopathy, an L4-L5 laminectomy, an L3-L4 microdiscectomy, "spasms lumbosacral spine", and chronic pain in both legs due to sciatic neuritis.  (Tr. 259-60) He also noted that her vision was 20/70 with glasses.  (Tr. 257)

Consultative psychologist Dr. Craig Nordstrom noted that Ellis would cry for no reason, often sat around, and reported a

dysthmic mood, insomnia, feelings of hopelessness, helplessness, and worthlessness, decreased energy, poor concentration, hyperphagia, passive suicidal ideation, and frequent anxiety. (Tr. 264) Dr. Nordstrom tested Ellis' IQ and determined that she had a verbal score of 66, a performance score of 74, and a full IQ score of 67, putting her in the extremely low range of intellectual functioning. (Tr. 266) Dr. Nordstrom diagnosed her with major depressive disorder and borderline intellectual functioning. (Tr. 266)

At the hearing before the ALJ, Ellis testified that she last worked as a housekeeper at a hotel in June 2007, but that she could not continue working because she had pain in her back and hands. (Tr. 38-39) She currently was seeing a doctor once a month for treatment for her back, legs, and wrists. (Tr. 39) She experienced back pain for periods of 30 to 60 minutes four times a day and took medication to relieve the pain. (Tr. 40) Her back pain increased when she was standing and "at time [sic] sitting down". (Tr. 42-43) Ellis also reported that she experienced pain and numbness running down her legs that was sometimes relieved by medication. (Tr. 42) Her hands sometimes had no feeling, hurt, and could not hold things. (Tr. 40) She could pick up coins every now and then, button shirts or zip a jacket sometimes, and dial a telephone sometimes. (Tr. 41) She could tie her shoes but

struggled to make a fist. (Tr. 41) She wore braces on both hands and was undergoing physical therapy for her back pain and hand problems. (Tr. 42) Ellis also reported numbness and pain in her feet and constant headaches. (Tr. 46-47) She experienced pain from headaches at a level nine on a ten point scale and neck pain at a level eight. (Tr. 48) She also reported problems walking "regular" and becoming so tired she had to lay down for at least half an hour twice a day. (Tr. 49-50)

Ellis estimated that she could walk about one block and stand for about ten minutes. (Tr. 43) She could not squat or stoop but could bend over slightly. She could sit for 15 minutes, after which she had to stand up for a couple of minutes. (Tr. 43) She had trouble sleeping, was able to attend to her personal grooming, sometimes did laundry, and went grocery shopping with her daughter and son. (Tr. 45) On a typical day, she got up and tried to clean her house, make her bed, and wash the dishes. (Tr. 44) Ellis' daughter helped her with cooking because Ellis could cook only "lunch meat or something like that". (Tr. 45) Ellis reported that she did not have any hobbies, her only activity was therapy, and she attended church. (Tr. 45-46)

VE Fisher was last to testify. (Tr. 52) The ALJ asked the VE to instruct her if any of his testimony conflicted with the

Dictionary of Occupational Titles (DOT). The VE agreed that he
would. The ALJ first asked the VE to consider a hypothetical
individual who was the same age as Ellis and had the same educa-
tion and work experience, who could perform light work, but only
occasionally climb ramps, stairs, ladders, ropes, or scaffolds,
could frequently balance, handle and reach, and occasionally
could stoop, kneel, crouch, or crawl. (Tr. 54) The individual
could understand, remember, and carry out simple, routine, and
repetitive one and two step tasks in an environment free of fast
pace and production requirements, and occasionally could interact
with supervisors, co-workers, and the public. (Tr. 54) The VE
testified that the hypothetical individual could not perform any
of Ellis' past work but that she could perform other jobs such as
dishwasher/silver wrapper (3,399 positions), cafeteria worker
(2,111 positions), and maid/housekeeper/laundry worker/ironer
(5,757 positions). If the same individual also was limited to
performing sedentary work, she could perform work as a general
office clerk II, cutter and paster press clippings, microfilm
document preparer, under hand packager/ampoule sealer, and tube
operator. (Tr. 55)

In her decision, the ALJ discussed the five-step sequential
evaluation process for determining whether an individual was
disabled. (Tr. 13-23) In step one, the ALJ found that Ellis had

not engaged in substantial gainful activity since July 19, 2007, her alleged onset date. (Tr. 13) At step two, the ALJ found that Ellis had the following severe impairments: chronic leg pain, borderline intellectual functioning, multiple sclerosis, and carpal tunnel syndrome. (Tr. 13)

At step three, the ALJ found that Ellis' impairments did not meet or medically equal one of the listed impairments. (Tr. 13-14) In particular, Ellis' chronic leg pain did not meet or medically equal Listing §1.02 for major dysfunction of a joint, her multiple sclerosis did not rise to the severity of Listing §11.09 for multiple sclerosis, and her intellectual functioning did not meet Listing §12.05. (Tr. 13-14) The ALJ went on to give a detailed discussion about why Ellis' condition did not meet Listing §12.05. (Tr. 14)

The Listing sets forth four paragraphs outlining the severity required to satisfy the Listing. (Tr. 14) Ellis did not satisfy Paragraph A because she could complete self-care activities without assistance. Ellis did not meet paragraph B because she did not have a verbal, performance, or full scale IQ of 59 or less. Paragraph C was not met because although she had an IQ Score of 67, falling within the range considered by Paragraph C, she did not have a physical or mental impairment that imposed additional work-related limitations. (Tr. 14) The ALJ explained

that the record did not reflect that Ellis was mentally retarded or diagnosed with borderline intellectual functioning prior to the age of 22, as required by Listing §12.05, and the fact that Ellis held jobs in the past, one of which rose to the semi-skilled level, suggested that she did not have significant deficits in adaptive functioning as a result of mental retardation or borderline intellectual functioning. (Tr. 14)

The requirements of Paragraph D were met if the claimant had an IQ score of 60 through 70, resulting in at least two of the following: marked restriction of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. (Tr. 15) The ALJ found that Ellis had mild restrictions in activities of daily living and social functioning because she could perform housework and self-care activities with no assistance, and she had no signs of hallucinations, delusions, or unusual thoughts. The ALJ determined that Ellis had moderate difficulties with concentration, persistence, and pace. (Tr. 15) Ellis attended special education classes in school and had a minimal ability to read and complete basic math problems, but during her consultative examination, the doctor noted that she was able to comprehend and respond to all queries and instructions. The ALJ

concluded that Ellis did not display any episodes of decompensation of extended duration. Therefore, Ellis did not have any marked limitations in any of the four areas, and did not satisfy paragraph D of Listing §12.05. (Tr. 15)

In determining Ellis' RFC, the ALJ stated that she considered the entire record and found that Ellis had the capacity to perform light work except: she could only occasionally stoop, kneel, crouch, crawl, or climb ramps, stairs, ladders, ropes, or scaffolds; she could frequently balance or perform activities requiring handling or reaching, but not continuously; she could understand, remember, and carry out simple routine, and repetitive one to two step tasks in an environment free of fast paced production requirements; and could occasionally interact with supervisors, co-workers, and the general public. (Tr. 16)

In reaching this determination, the ALJ first discussed Ellis' testimony regarding her pain, limitations, and daily activities. (Tr. 17) The ALJ next concluded that Ellis' medically determinable impairments reasonably could be expected to cause the alleged symptoms but that her statements concerning the intensity, persistence, and limiting effects were not credible to the extent they were inconsistent with the RFC. (Tr. 17) The ALJ provided no further discussion and went on to discuss Ellis' medical history.

The ALJ first explained that Ellis' treating physician limited her to light work in 2007. Dr. Sheikh conducted a consultative examination that same year and diagnosed Ellis with a herniated disc at L4-5 with radiculopathy, spasms in her lumbosacral spine, and chronic pain in both legs. (Tr. 18) Dr. Sheikh noted that Ellis experienced occasional shortness of breath, was stable, and had a full range of motion in her lumbar, thoracic, cervical region, and extremities. Ellis had a normal gait, but she was unable to stoop, squat, or walk heel to toe tandemly. The ALJ concluded that Dr. Sheikh's findings demonstrated that Ellis had some functional limitations but that she retained the ability to perform a wide range of work-related activities. (Tr. 18)

The ALJ next discussed the state agency disability examiner's conclusions from September 2007. (Tr. 18) The examiner determined that Ellis was capable of performing light work. Ellis could balance frequently, but she could stoop, kneel, crouch, crawl, or climb only occasionally. The examiner did not identify any other limitations. His assessment was affirmed by a second state agency examiner in November 2007. (Tr. 18) The ALJ found these assessments "extremely consistent with the evidence of record, and reasonable given the nature of this evidence." (Tr. 18-19)

The ALJ went on to discuss Ellis' psychological evaluations. (Tr. 19) In September 2007, Dr. Nordstrom diagnosed Ellis with recurrent moderate major depressive disorder, borderline intellectual functioning, and alcohol dependence in sustained full remission. He assigned her a GAF score of 53, indicating moderate symptoms.[1] (Tr. 19) Ellis informed him that she completed the ninth grade but that she was enrolled in special education courses for students with mild mental handicaps. She reported depression, anxiety, insomnia, hopelessness, poor concentration, and decreased energy. She did not take any psychotropic medications and was able to care for her personal needs and hygiene although she could not perform household chores. She did not display any signs of hallucinations, delusions, or unusual thoughts. Her thought process was logical, her behavior goal-oriented, and she was able to concentrate and respond to questions and instructions. (Tr. 19) He administered an IQ test and found that her verbal IQ was 66, her performance IQ was 74, and her full scale IQ score was 67. (Tr. 19)

---

[1]The GAF scale measures a "clinician's judgment of the individual's overall level of functioning." Am. Psychiatric Ass'n, *Diagnosis and Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision, 32, 34 (2000) (DSM IV-TR). The established procedures require a mental health professional to assess an individual's current level of symptom severity and current level of functioning, and adopt the lower of the two scores as the final score. *Id*. at 32–33. A GAF score ranging from 41–50 indicates serious symptoms; scores ranging from 51–60 indicate moderate symptoms; and scores ranging from 61–70 indicate mild symptoms. *Id*.

A state agency examiner also considered Ellis' mental residual functional capacity in September 2007, finding that Ellis was moderately limited in her ability to maintain attention and concentration for extended periods, to complete a normal workday or work week without interruption from her psychological symptoms, and to understand, remember, and carry out detailed instructions. (Tr. 19) The examiner also noted that Ellis was not significantly limited in her ability to perform 16 other work-related activities including understanding and carrying out other instructions, performing activities within a schedule, and maintaining regular attendance. A second state agency examiner affirmed this assessment in November 2007. The second state agency examiner relied heavily on Dr. Nordstrom's consultative examination findings and concluded that Ellis was able to perform a wide range of tasks. (Tr. 19) He based this on her GAF score of 53, indicating moderate limitations, and her daily activities. He further noted the fact that Ellis had a work history weighed against the contention that her intelligence limited her ability to work and that she stopped working primarily due to her physical symptoms. (Tr. 19)

The ALJ went on to discuss Ellis' more recent medical history. Dr. Anigbo recommended that Ellis undergo a spinal tap and MRI in August 2008, which revealed multiple sclerosis. (Tr.

20)  The ALJ noted that Ellis complained of lower extremity pain but that she walked without an assistive device.  Physical therapy was recommended.  It was noted that Ellis had multiple sclerosis, poor balance, and fibromyalgia.  (Tr. 20)

Dr. Vyas conducted an examination of Ellis in May 2009, diagnosing her with headaches, cervical neck pain, peripheral neuropathy, and gait disturbance.  (Tr. 20) Ellis had full strength in her right upper and lower extremities and 3/5 strength in her left extremities.  Her cerebellar examination yielded nothing significant, but she had a decreased sensation to light touch and vibration and a limping gait.  (Tr. 20)

When Ellis began physical therapy in February 2009, her gait was antalgic and unsteady, but her balance, lower extremity strength, and endurance were fair, and her upper extremity strength was good.  (Tr. 21) Ellis was off work until further notice, but she was instructed to engage in a home exercise program and given a refill of her prescriptions.  The ALJ noted that Exhibit 12E reflected identical findings throughout 2009. (Tr. 21) The ALJ explained that the treating sources' opinions that Ellis should remain off work until further notice was given little weight because the clinical findings at that time did not indicate disabling pain or limitations.  The ALJ found Dr. Anigbo's opinion to be generalized and unsupported and concluded

that because Ellis was directed to engage in home exercise, she also could perform light work.  (Tr. 21)

The ALJ concluded by explaining that the records and testimony reveal that Ellis' pain and multiple sclerosis limit her to occasionally stooping, kneeling, crouching, crawling, or climbing, and frequently balancing.  The ALJ found that Ellis could perform activities involving reaching and handling frequently but not continuously because of her carpal tunnel.  (Tr. 21)

With the RFC determined, at step four the ALJ found that Ellis could not perform her past relevant work.  (Tr. 21) At step five, the ALJ found that considering Ellis' age, education, work experience, and RFC, there were significant jobs available in the national economy that she could perform, including dishwasher-silver wrapper (3,399 positions), a cafeteria attendant (2,111 positions), and a maid/housekeeper (5,757 positions).  (Tr. 22)

## Discussion

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence.  42 U.S.C. §405(g) ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive.");
*Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Lopez ex*

*rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Sub-

stantial evidence has been defined as "such relevant evidence as

a reasonable mind might accept to support such a conclusion."

***Richardson v. Perales***, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28

L.Ed.2d 852, (1972)(*quoting* ***Consolidated Edison Company v. NLRB***,

305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 140 (1938)). *See*

*also* ***Jens v. Barnhart***, 347 F.3d 209, 212 (7th Cir. 2003); ***Sims v.***

***Barnhart***, 309 F.3d 424, 428 (7th Cir. 2002). An ALJ's decision

must be affirmed if the findings are supported by substantial

evidence and if there have been no errors of law. ***Rice v. Barn-***

***hart***, 384 F.3d 363, 368-69 (7th Cir. 2004); ***Scott v. Barnhart***,

297 F.3d 589, 593 (7th Cir. 2002). However, "the decision cannot

stand if it lacks evidentiary support or an adequate discussion

of the issues." ***Lopez***, 336 F.3d at 539.

Supplemental insurance benefits are available only to those

individuals who can establish "disability" under the terms of the

Social Security Act. The claimant must show that he is unable

"to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be ex-

pected to last for a continuous period of not less than 12

months." 42 U.S.C. §423(d)(1)(A). The Social Security regula-

tions enumerate the five-step sequential evaluation to be fol-

17

lowed when determining whether a claimant has met the burden of establishing disability. 20 C.F.R. §416.920. The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." 20 C.F.R. §416.920(b). If she is, the claimant is not disabled and the evaluation process is over. If she is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities." 20 C.F.R. §416.920(c). Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. 20 C.F.R. §401, pt. 404, subpt. P, app. 1. If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" and the physical and mental demands of her past work. If, at this fourth step, the claimant can perform her past relevant work, she will be found not disabled. 20 C.F.R. §416.920(e). However, if the claimant shows that her impairment is so severe that she is unable to engage in her past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of her age, education, job experience and functional capacity to work, is capable of performing other work

and that such work exists in the national economy.  42 U.S.C. §423(d)(2); 20 C.F.R. §416.920(f).

Ellis first challenges the ALJ's RFC finding on three grounds.  First, Ellis argues that the ALJ failed to consider the entire record because she did not mention several of Ellis' diagnosed impairments.  Second, Ellis argues that the ALJ failed to assign the appropriate weight to an examining physician's opinion and, therefore, did not properly assess her limitations in stooping, squatting, and balancing.  Third, Ellis complains that the ALJ did not account for the lapse of time and additional medical evidence that arose after the state medical examiners rendered their opinions and the ALJ conducted the hearing.

SSR 96-8p explains how an ALJ should assess a claimant's RFC at steps four and five of the sequential evaluation.  In a section entitled, "Narrative Discussion Requirements," SSR 96-8p specifically spells out what is needed in the ALJ's RFC analysis.  This section of the Ruling provides:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-

related activity the individual can perform
based on the evidence available in the case
record. The adjudicator must also explain how
any material inconsistencies or ambiguities
in the evidence in the case record were con-
sidered and resolved. (footnote omitted)

SSR 96-8p

Thus, as explained in this section of the Ruling, there is a
difference between what the ALJ must contemplate and what she
must articulate in her written decision. *See Morphew v. Apfel*,
2000 WL 682661, *3 (S.D. Ind. Feb. 15, 2000)("There is a distinc-
tion here [in SSR 96-8p] between what the ALJ must consider and
what the ALJ must articulate in the written opinion."); *Lawson v.
Apfel*, 2000 WL 683256, *2-4 (S.D. Ind. May 25, 2000) (ALJ who
restricted the claimant to medium work satisfied the requirements
of SSR 96-8p)("[SSR 96-8p] does not require an ALJ to discuss all
of a claimant's abilities on a function-by-function basis.
Rather, an ALJ must explain how the evidence supports his or her
conclusions about the claimant's limitations and must discuss the
claimant's ability to perform sustained work activities.").

An ALJ need only "minimally articulate his or her justifica-
tion for rejecting or accepting specific evidence of a disabil-
ity" and is not required to provide a written statement about
every piece of evidence in the record. *Rice*, 384 F.3d at 371
(internal citations omitted). The ALJ only needs to "make a
bridge between the evidence and the outcome as to his . . .

determination." ***Rice***, 384 F.3d at 372. *See also **Haynes v. Barnhart***, 416 F.3d 621, 626 (7th Cir. 2005) (stating that the ALJ must build a logical bridge between the evidence and conclusion); ***Zurawski v. Halter***, 245 F.3d 881, 889 (7th Cir. 2001)(same); ***Clifford v. Apfel***, 227 F.3d 863, 872 (7th Cir. 2000) (same). The law does not require the ALJ to discuss every detail of the record, as long as she considered evidence in the record that was favorable to the claimant. ***Golembiewski v. Barnhart***, 322 F.3d 912, 917 (7th Cir. 2003). The ALJ may not ignore an entire line of evidence that was favorable to the claimant*. See, e.g.*, ***Zurawski***, 245 F.3d at 887; ***Henderson v. Apfel***, 179 F.3d 507, 514 (7th Cir. 1999); ***Zblewski v. Schweiker***, 732 F.2d 75, 78-79 (7th Cir. 1983). Otherwise it is impossible for a reviewing court to tell whether the ALJ's decision rests upon substantial evidence. ***Golembiewski***, 322 F.3d at 917.

Ellis' first and third challenges to the ALJ's RFC finding overlap. The ALJ adopted the findings of the reviewing physician that were completed in 2007. However, three years elapsed between the physician rendering his opinion and the ALJ's decision. During this time Ellis continued to seek medical treatment and was diagnosed with several additional impairments, including fibromyalgia, chronic pain syndrome, diabetes, osteoarthritis, and peripheral neuropathy. The ALJ did not mention these or her

earlier diagnoses of ataxia, gouty arthritis, hypertension, anemia, and degenerative disc disease in the opinion.

Although Ellis did not show how consideration of these diagnoses would further limit her abilities and affect the final disposition of her claim, Ellis' shortcomings are outweighed by the ALJ's failure to fulfill her duty and create a logical bridge between the evidence and her conclusion. The court cannot accept an opinion that omits mention of eleven diagnosed impairments and ignores three years of medical history. Although the ALJ stated that she considered all the evidence of record, if this boiler-plate statement was all the ALJ was required to provide, the court would be forced to speculate whether diagnoses were in fact considered, and the claimant would be denied meaningful review. The ALJ, while not required to engage in a meaningful discussion of every piece of evidence, cannot ignore a substantial amount of medical history, particularly that which may be favorable for the claimant, without providing some explanation. At minimum, the ALJ should have explained why she disregarded the three year lapse between the reviewing physicians rendering their opinions and her decision and why the additional impairments would not affect Ellis' RFC. Despite the Commissioner pointing to medical evidence substantiating the ALJ's decision, he was unable to point to any recent evidence showing that the ALJ's RFC finding

would stand irrespective of the three years of treatment Ellis sought after the reviewing physician gave the opinion the ALJ adopted.  The court cannot speculate whether these diagnoses and the lapse of time, if considered, would have affected the ALJ's opinion.  Therefore, Ellis' claim is **REMANDED** to the Social Security Administration to consider the impairments that were omitted from the ALJ's decision and the affect of the three year lapse of time between the reviewing physician's opinion and the ALJ's decision.

Ellis raises an additional challenge to the RFC, arguing that the ALJ did not account for her limitations in stooping, squatting, and balancing.  Dr. Sheikh examined Ellis on directive of the state.  She found that Ellis was unable to stoop, squat, or walk heel to toe tandemly, and that she was unstable and off balance.  A state agency physician reviewed the record, but did not examine Ellis, and concluded that Ellis could stoop, squat, and walk heel to toe tandemly on occasion and could frequently balance.  The ALJ adopted the reviewing physician's opinion and found that Ellis occasionally could perform these activities. The ALJ's only explanation was that "these assessments are extremely consistent with the evidence of record, and reasonable given the nature of the evidence."  (Tr. 18-19)

The ALJ is required to resolve conflicts in the evidence, including conflicting medical opinions, and must minimally articulate her reasons for assigning greater weight to one physician's opinion. *Crenshaw v. Barnhart*, 2003 WL 360102, *10 (N.D. Ill. Feb. 18, 2003). The ALJ should consider a variety of factors when assigning weight to conflicting opinions, including whether a physician is a treating, examining, or reviewing physician, the length, nature and extent of the relationship, the physician's specialty, and the consistency and supportability of the physician's opinion. *Crenshaw*, 2003 WL 360102 at *10 (*citing* 20 C.F.R. §416.927(d)). The ALJ generally should assign greater weight to the opinions of an examining source than those of a physician who has not examined the claimant. 20 C.F.R. §416.917(d)(1). This is because an examining physician has spent more time with the claimant and can provide a better perspective. *See* 20 C.F.R. §416.927(d)(2). The ALJ cannot substitute her judgment for a physician's opinion and must make it clear in her opinion that she recognized the conflict and weighed the evidence accordingly. *Crenshaw*, 2003 WL 360102 at *10. The ALJ is not required to engage in a meaningful discussion of every piece of evidence, but she must consider the important evidence contradicting her opinion and explain her reason for discounting it. *Crenshaw*, 2003 WL 360102 at *10.

Here, the ALJ does not even attempt to articulate her reasons for adopting the reviewing physician's opinion. The only explanation the ALJ offered was that the opinion she adopted was extremely consistent with the evidence of record and reasonable given the nature of the evidence. The ALJ did not expressly recognize the conflict between Dr. Sheikh and the reviewing physician's opinion and did not engage in any discussion of how the objective medical evidence supported the reviewing physician's opinion and conflicted with Dr. Sheikh's. The court cannot simply accept the ALJ's conclusion that her opinion was reasonable. This is an assessment reserved for the court. The court must engage in an analysis of the evidence the ALJ relied on in her opinion to determine if there was sufficient evidence to support her decision, and here there is no explanation of the evidence for the court to assess. The court will not speculate on the basis of the ALJ's opinion.

However, the court's inquiry does not end here. The court will not remand a claim on an issue that is not outcome determinative. *See **Keys v. Barnhart***, 347 F.3d 990, 994-95 (7th Cir. 2003) (explaining that where it is clear that the ALJ's decision would not be overturned by remanding the issue for further consideration, the doctrine of harmless error applies to prevent remand). Two of the light positions and none of the sedentary

positions the VE identified for someone of Ellis' capabilities involved any balancing, stooping, or crouching. Therefore, even if the ALJ erred in failing to recognize that Ellis was incapable of performing these activities, she was capable of filling a significant number of positions in the regional economy that did not require these activities and was not disabled within the meaning of the Act.

Ellis counters that the VE may have concluded that there were no jobs available to someone with Ellis' other limitations and the inability to stoop, crawl, and balance. Ellis relies on *Kasarsky v. Barnhart*, 335 F.3d 539, 544 (7th Cir. 2003) for the proposition that omitting one limitation could alter the ALJ's entire analysis and lead to a different outcome. However, the circumstances of that case vary significantly from those present here. In *Kasarsky*, the ALJ failed to ask the VE the availability of positions for someone with three of the claimant's limitations, including limited exertional abilities, borderline intelligence, and frequent deficiencies of concentration, persistence, or pace. The court explained that "[e]mployers are entitled to demand that their employees stick with the job, once they have been trained to do it; the length of time it takes someone with borderline intelligence to learn a job is not the same as the ability of that person to perform consistently once trained."

*Kasarsky*, 335 F.3d at 544. The omitted limitations could have eliminated all possible positions because they could have interfered with training and retention. Here, the limitations the ALJ excluded would not have such a limiting effect. If Ellis was unable to stoop, crawl, or balance, it would not affect her training or retention, and Ellis has not provided any other explanation for why the number of positions would be reduced by consideration of these additional limitations. Positions remained available, consistent with Ellis' other limitations and the DOT descriptions, that would accommodate an inability to stoop, crawl, or balance.

Ellis next challenges the ALJ's credibility determination. This court will sustain the ALJ's credibility determination unless it is "patently wrong" and not supported by the record. *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) ("Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed."). The ALJ's "unique position to observe a witness" entitles her opinion to great deference. *Nelson v. Apfel*, 131 F.3d 1228, 1237 (7th Cir. 1997); *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006). However, if the ALJ does not make explicit findings and does not explain them "in a way that

affords meaningful review," the ALJ's credibility determination
is not entitled to deference. ***Steele v. Barnhart***, 290 F.3d 936,
942 (7th Cir. 2002). Further, "when such determinations rest on
objective factors or fundamental implausibilities rather than
subjective considerations [such as a claimant's demeanor],
appellate courts have greater freedom to review the ALJ's deci-
sion." ***Clifford***, 227 F.3d at 872.

The ALJ must determine a claimant's credibility only after
considering all of the claimant's "symptoms, including pain, and
the extent to which [the claimaint's] symptoms can reasonably be
accepted as consistent with the objective medical evidence and
other evidence." 20 C.F.R. §404.1529(a); ***Arnold v. Barnhart***, 473
F.3d 816, 823 (7th Cir. 2007)("subjective complaints need not be
accepted insofar as they clash with other, objective medical
evidence in the record."); ***Scheck v. Barnhart***, 357 F.3d 697, 703
(7th Cir. 2004). If the claimant's impairments reasonably could
produce the symptoms of which the claimant is complaining, the
ALJ must evaluate the intensity and persistence of the claimant's
symptoms through consideration of the claimant's "medical his-
tory, the medical signs and laboratory findings, and statements
from [the claimant, the claimant's] treating or examining physi-
cian or psychologist, or other persons about how [the claimant's]
symptoms affect [the claimant]." 20 C.F.R. §404.1529(c); ***Schmidt,***

395 F.3d at 746-47 ("These regulations and cases, taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from merely ignoring the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding.").

Although a claimant's complaints of pain cannot be totally unsupported by the medical evidence, the ALJ may not make a credibility determination "solely on the basis of objective medical evidence." SSR 96-7p, at *1. *See also **Indoranto v. Barnhart**, 374 F.3d 470, 474 (7th Cir. 2004); **Carradine v. Barnhart**, 360 F.3d 751, 754 (7th Cir. 2004) ("If pain is disabling, the fact that its source is purely psychological does not disentitle the applicant to benefits."). Rather, if the

> [c]laimant indicates that pain is a significant factor of his or her alleged inability to work, the ALJ must obtain detailed descriptions of the claimant's daily activities by directing specific inquiries about the pain and its effects to the claimant. She must investigate all avenues presented that relate to pain, including claimant's prior work record, information and observations by treating physicians, examining physicians, and third parties. Factors that must be considered include the nature and intensity of the claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for relief of pain, functional restrictions, and the claimant's daily activities. (internal citations omitted).

> *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir.
> 1994)

*See also* ***Zurawski***, 245 F.3d at 887-88.

In addition, when the ALJ discounts the claimant's descrip-tion of pain because it is inconsistent with the objective medical evidence, she must make more than "a single, conclusory statement . . . . The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p at *2. *See* ***Zurawski***, 245 F.3d at 887; ***Diaz v. Chater***, 55 F.3d 300, 307-08 (7th Cir. 1995) (finding that the ALJ must articulate, at some minimum level, her analysis of the evidence). She must "build an accu-rate and logical bridge from the evidence to [her] conclusion." ***Zurawski***, 245 F.3d at 887 (*quoting* ***Clifford***, 227 F.3d at 872). When the evidence conflicts regarding the extent of the claim-ant's limitations, the ALJ may not simply rely on a physician's statement that a claimant may return to work without examining the evidence the ALJ is rejecting. *See* ***Zurawski***, 245 F.3d at 888 (*quoting* ***Bauzo v. Bowen***, 803 F.2d 917, 923 (7th Cir. 1986)) ("Both the evidence favoring the claimant as well as the evidence favoring the claim's rejection must be *examined*, since review of

the substantiality of evidence takes into account whatever in the record fairly detracts from its weight.") (emphasis in original).

The ALJ provided a boilerplate statement that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of those symptoms are not credible to the extent they are inconsistent with the residual functional capacity".  After making this finding, the ALJ immediately went on to discuss the objective medical evidence.  The ALJ did not delve into any discussion of the inconsistencies between the objective medical evidence and Ellis' testimony concerning her daily activities, the location, duration, frequency and intensity of pain, and the factors that aggravated and relieved her symptoms.  *See* SSR 96-7, 20 C.F.R. §404.1529(c) (explaining that the ALJ must consider these factors when assessing credibility).  Although the ALJ stated that her decision was consistent with the record as a whole, her opinion was devoid of even one discrepancy to substantiate her finding.  The ALJ must provide specific reasons for discrediting the claimant's testimony, and here the ALJ has not pointed to any reasons.  Therefore, the ALJ has not fulfilled her duty and Ellis' claim must be **REMANDED** for further proceedings on this issue.  SSR 96-7p at *2.  *See Zurawski*, 245 F.3d at 887;

*Diaz*, 55 F.3d at 307-08 (finding that the ALJ must articulate, at some minimum level, his analysis of the evidence).

Ellis also argues that the ALJ relied on a mistake when analyzing whether her condition satisfied Listing §12.05. To show that she met a listed impairment, the claimant must prove that her condition satisfied each of the required criterion. *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999) (explaining that the claimant carries the burden of proof to show that her condition meets each requirement of the listed condition). A condition that met only some of the required medical criteria, "no matter how severely," will not qualify as meeting a listing. *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990).

Section 12.00(A) of the Social Security Regulations describes the structure of Listing §12.05. Specifically, the regulations state that if an "impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria," an impairment will successfully meet the Listing. 20 C.F.R. §401 pt. 404, subpt. P, app. 1 §12.00(A). Listing §12.05(C) provides in relevant part:

> 12.05 *Mental retardation*: Mental retardation
> refers to significantly subaverage general
> intellectual functioning with deficits in
> adaptive functioning initially manifested
> during the developmental period; i.e, the

evidence demonstrates or supports onset of
the impairment before age 22.

The required level of severity for this dis-
order is met when the requirements in A, B,
C, or D are satisfied.

* * *

B.  A valid verbal, performance, or full
scale IQ of 59 or less; or

C. A valid verbal, performance, or full
scale IQ score of 60 through 70 and a
physical or other mental impairment
imposing an additional and significant
work-related limitation of function.

20 C.F.R. §401 pt. 404, subpt. P, app. 1
§12.05(C)

Thus, the structure of Listing §12.05 indicates that a claimant

must show *both* that she has met the Listing's definition of

mental retardation, *and* that she has met the required severity

level by satisfying the requirements in either A, B, C, or D.

***Mendez v. Barnhart***, 439 F.3d 360, 362 (7th Cir. 2006).

In order to meet Listing §12.05(C), there first must be

evidence that "subaverage intellectual functioning" manifested

prior to age 22.  If a claimant meets the definition of mental

retardation, then the analysis shifts to whether the claimant's

mental retardation is sufficiently severe to qualify as a dis-

ability, which is met when the requirements in either A, B, C, or

D are proven.  20 C.F.R. §401 pt. 404, subpt. P, app. 1 §12.05.

If the individual is mentally retarded as defined by the regula-

33

tions and has an IQ of less than 60, the claimant is considered disabled under Listing §12.05 without further inquiry. 20 C.F.R. §401 pt. 404, subpt. P, app. 1 §12.05(B). However, an IQ over 60 is insufficient to establish disability under Listing §12.05 alone, since people with low IQ's may nevertheless be able to perform gainful employment. *Novy v. Astrue*, 497 F.3d 708, 709 (7th Cir. 2007). Thus, a claimant with an IQ between 60 and 70 must also show a "physical or other mental impairment" that creates an additional, and significant, limitation on his ability to work. 20 C.F.R. §401 pt. 404, subpt. P, app. 1 §12.05(C). *See Maggard*, 167 F.3d at 380.

The circuit courts presume that a person's IQ remains stable, absent evidence of a change in intellectual function. *Muncy v. Apfel*, 247 F.3d 728, 734 (8th Cir. 2001). *See, e.g., Guzman v. Bowman*, 801 F.2d 273, 275 (7th Cir. 1986)(absent evidence to the contrary, IQ test taken subsequently "should be assumed" to reflect IQ during the insured period); *Branham v. Heckler*, 775 F.2d 1271, 1274 (4th Cir. 1985)(fact that no IQ test was taken earlier in life "does not preclude a finding of retardation"). However, a stable IQ, albeit low, does not necessarily equate to a showing of mental retardation as defined by Listing §12.05(C) before age 22, as the Seventh Circuit has indicated

that people with low IQs nevertheless may be able to perform work. *Novy*, 497 F.3d at 709.

Pursuant to regulations, the ALJ is allowed in determining qualification under Listing §12.05 to consider evidence concerning past work history in assessing "ability or inability to function in a work setting." 20 C.F.R. §401 pt. 404, subpt. P, app. 1 §12.00(A). *See Adkins v. Astrue*, 226 Fed. Appx. 600, 605 (7th Cir. 2007)(while low IQ scores might be an indicator of retardation, other items, "including . . . employment history, must be considered and weighed;" claimant failed to prove deficits prior to age 22 even though school records were submitted showing only eighth grade was completed, due in part to his long work history); *Maggard*, 167 F.3d at 380 (no mental retardation, even though a low IQ score existed, in part due to claimant's ability to withstand the stress and pleasures associated with a day-to-day work activity"). Courts considering whether an individual meets Listing §12.05 generally have focused their analysis on the claimant's IQ scores, education, work experience, activities, and ability to perform daily life activities. *See Adkins*, 226 Fed. Appx. at 605; *Maggard*, 167 F.3d at 380. The claimant's activities of daily living, work experience, and education must be consistent with her low IQ score to satisfy Listing §12.05. *Adkins*, 226 Fed. Appx. at 605.

Ellis argues that the ALJ may have reached a different conclusion had she been aware that none of Ellis' past jobs rose to the level of semi-skilled. Ellis contends that concluding otherwise would require speculation by the court. However, it does not appear that the ALJ placed any emphasis on this mis-statement. The ALJ stated that "the fact that the claimant has held jobs in the past, one of which even rose to the semi-skilled level . . ., further suggests that she does not have significant deficits in adaptive functioning as a result of mental retarda-tion or BIF." (Tr. 14) The ALJ was more concerned that Ellis held jobs in the past, an element she was permitted to consider, than the level of skill required for the positions. Based on the wording, it appears that the ALJ gave the skill level of Ellis' past employment in passing, rather than as a determining factor.

This, however, does not mean that the ALJ's assessment of Listing §12.05 was correct. The ALJ's decision was based primar-ily on her belief that the record failed to establish that Ellis had borderline intellectual functioning prior to the age of 22. Borderline intellectual functioning is defined as an individual with a an IQ of 71-84. *The Merck Manual of Diagnosis and Ther-apy*, Fifteenth Edition, 1983 (1987). Although there is no record of an IQ test taken before Ellis turned 22, there is a presump-tion that her IQ of 67, which falls below this range, was the

same at age 22 as it was when the test was administered.  See *Guzman*, 801 F.2d at 275 (absent evidence to the contrary, IQ test taken subsequently "should be assumed" to reflect IQ during the insured period).  The record does not reflect that Ellis suffered any traumatic events that could have decreased her IQ between the time she was 22 and the time the test was administered.  Therefore, the ALJ must either explain why she believed Ellis' IQ was higher at age 22 or why she believed Ellis does not satisfy Listing §12.05(C) despite having borderline intellectual functioning prior to the age of 22.  Because this decision may have been in error, if on remand, the ALJ is unable to find evidence to overcome the presumption that Ellis' IQ has remained stable throughout her life and the ALJ concludes that despite this diagnosis Ellis does not meet Listing §12.05(C), the ALJ must provide more explanation of why Ellis' physical or mental impairments do not impose additional and significant work-related limitations, placing her outside the scope of Listing §12.05(C).

Ellis' final challenge was that the ALJ did not resolve an inconsistency between the VE's testimony and the DOT.  However, Ellis conceded that this was harmless error.

_____

Based on the foregoing reasons, the decision of the Commis-
sioner of Social Security is **REMANDED** for further proceedings
consistent with this Order.

ENTERED this 2nd day of February, 2012


                                    s/ ANDREW P. RODOVICH
                                       United States Magistrate Judge